UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

MAHFOOZ AHMAD,       :
               Plaintiff,

                            :         OPINION AND ORDER
      -against-                    20 Civ. 4507 (AT) (GWG)

                            :

COLIN DAY, et al.,
                            :

             Defendants.  :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United State Magistrate Judge**

      Pro se plaintiff Mahfooz Ahmad brings this employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, New York State Human Rights Law, N.Y. Exec. Law §§ 290-97 and New York City Humans Rights Law, N.Y. City Admin. Code §§ 8-101 to -31 alleging his former employer, iCIMS Inc. ("iCIMS"), and two individual defendants, Colin Day and Courtney Dutter, discriminated against him because of his race, color, religion and national origin. Before the Court is defendants' motion to compel arbitration under the Federal Arbitration Act ("FAA").[1] For the following reasons, defendants' motion is denied.[2]

---

[1] Motion to Compel Arbitration, filed January 8, 2021 (Docket # 24) ("Def. Mot."); Declaration of Lisa M. Griffith in Support, filed January 8, 2021 (Docket # 24-1) ("Griffith Decl."); Memorandum of Law in Support, filed January 8, 2021 (Docket # 25) ("Def. Mem."); Opposition to Motion to Compel Arbitration, filed May 3, 2021 (Docket # 54) ("Pl. Opp."); Reply Memorandum of Law in Support, filed June 10, 2021 (Docket # 65) ("Def. Reply"); Affidavit of Douglas Kersten in Support, filed June 10, 2021 (Docket # 66); Affidavit of Brandon Sosnoskie in Support, filed June 10, 2021 (Docket # 67) ("Sosnoskie Aff."); Reply Memorandum of Law in Support, filed June 10, 2021 (Docket # 68); Sur-Reply in Opposition to Motion to Compel Arbitration, filed June 13, 2021 (Docket # 69) ("Pl. Sur-Reply"); Sur-Sur-Reply Memorandum of Law in Support, filed June 24, 2021 (Docket # 70).

[2] "District courts in this Circuit regularly have concluded that a motion to compel arbitration and stay litigation pending arbitration is non-dispositive and therefore within a Magistrate Judge's purview to decide without issuing a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b)." Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 227 n.1 (S.D.N.Y. 2020) (collecting cases).

I. BACKGROUND

    A. Facts

Ahmad started working at iCIMS in February 2016.  See Complaint, filed June 11, 2020 (Docket # 2), at *6[3] ("Comp."); Griffith Decl. ¶ 4; Letter from M. Ahmad, filed May 21, 2021 (Docket # 64).  He began "as a Junior Project Specialist" but, according to Ahmad, his title changed twice "[d]ue to [his] great work performance."  Comp. at *6.  In January 2016, before his employment began, defendants informed Ahmad that his acceptance of the offer of employment was contingent upon the "execution of the . . . Employee Confidentiality and Proprietary Rights Agreement."  Exh. D of Griffith Decl.  In December 2016 and May 2018, when his title at iCIMS changed, defendants sent emails to Ahmad similarly stating that acceptance of the offer for these new titles was contingent upon his execution of the Employee Confidentiality and Proprietary Rights Agreement (the "Confidentiality Agreement").  See Exh. A of Pl. Opp.; Exh. B of Pl. Opp.  The Confidentiality Agreement, at least in its most recent form, contains an arbitration clause.  See Exh. A of Griffith Decl. ¶ 11.3 ("Confidentiality Agreement").

In the defendants' view, "[t]he [Confidentiality] Agreement is part of the offer and acceptance process at iCIMS."  Sosnoskie Aff. ¶ 6.  According to defendants, Ahmad accepted the Confidentiality Agreement "by entering his internal credentials and clicking on a check box marked 'I ACCEPT.'"  Id. ¶ 7.  Ahmad denies ever receiving or signing the Confidentiality Agreement.  See Declaration of Mahfooz Ahmad, annexed as Exh. 11 to Pl. Opp. ¶¶ 1-2; Pl. Opp. at 4.

---

[3] *___ refers to pages assigned by the ECF system.

According to Ahmad's complaint, notwithstanding his allegedly excellent work, "[w]hen it came to increasing [his] salary, nothing was done" and he was eventually given a "really low salary increase of mere [sic] few dollar per week." Comp. at *6. He was told that he was not getting a pay increase because others in the company had gotten one. Id. Ahmad points out that, at the time, the "majority of the employees [at iCIMS] were white people." Id.

In May 2018, Ahmad "submitted a business plan for a new business model to iCIMS CEO 'Colin Day.'" Comp. at *6. Five days after submitting this business plan, Ahmad was fired. Id. The explanation he was given for the firing was that he had "violated company policy." Id. Ahmad alleges that he did not in fact violate company policy and thus that his employer's contention otherwise was a "complete lie." Id. (emphasis omitted).

Ahmad alleges that, during his employment, he "was a victim of many instances of discrimination" including being "expected to work 60+ hours" per week "with no overtime pay," being the only person asked to work on weekends, that he was not "paid for . . . work done on weekends," that multiple calls were scheduled during his "compulsory Friday prayer" time despite "iCIMS management [being] aware that [he is] a Muslim," that Halal food was never ordered when food was ordered for employees, and that generally he was "given the worst . . . responsibilities on the lowest possible salary," despite receiving praise for his work. Comp. at *6-7.

At his termination, iCIMS offered Ahmad a severance payment but "[t]he money offered by iCIMS was nothing compared to the discrimination" he faced. Comp. at *7. Ahmad asserts that "[t]his complaint is only about the discrimination I faced during my employment with iCIMS and I think other employees of color are continuing to face due to their color, race, religious beliefs and ethnic background." Id.

In the section titled "Cause of Action," the complaint lists claims of employment discrimination under Title VII and other federal and state employment discrimination laws. Comp. at 3-4. It lists no other claims. Under "Adverse Employment Action," Ahmad lists a number of adverse actions including the termination of his employment, failure to promote, unequal terms and conditions of employment, and "discrimination in job advertisement and paid me lower salary." Id. at 5. As the basis for his Title VII claim, he asserts that the defendants discriminated against him based on his race ("Asian"), color ("Brown"), religion ("Islam") and national origin ("Pakistani"). Id. at 3. In the summary of facts, Ahmad states that the defendants "performed no investigation of my complaint of discrimination on bases [sic] of color, race, religious beliefs and ethnic background." Id. at 5.

B. Procedural Background

Ahmad, proceeding pro se, filed the complaint in this action on June 11, 2020. See Comp. Although an attorney filed a notice of appearance on behalf of Ahmad on December 1, 2020 (Docket # 17), the attorney quickly withdrew (Docket # 22), and Ahmad resumed his pro se status.

Defendants filed the instant motion on January 8, 2021. Ahmad then filed a letter seeking an extension of time to respond to the motion and expedited discovery. See Letter from M. Ahmad, dated January 13, 2021 (Docket # 26). Ahmad made several discovery requests in this letter including requesting the metadata of his alleged signing of the Confidentiality Agreement. See id. ¶ 13. Defendants opposed this request, and sought "a stay of discovery pending the Court's determination on Defendants' Motion to Compel Arbitration." Letter Motion to Stay, filed January 19, 2021 (Docket # 28), at 1. On February 22, 2021, this Court granted defendants' motion for a stay of discovery "except with respect to plaintiff's request for

4

discovery regarding the metadata of the alleged acceptance of the confidential agreement." (Docket # 34 at 3) (punctuation omitted).  A number of disputes ensued regarding the defendants' provision of the metadata (Docket ## 37-39, 42, 44-45, 51, 53).  The Court ultimately ruled that defendants had satisfied their production obligation.  See Order, filed May 7, 2021 (Docket # 57), at 2.  The parties thereafter completed briefing on the motion to compel arbitration.

II. GOVERNING LAW

The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution."  Ross v. Am. Express Co., 547 F.3d 137, 142 (2d Cir. 2008) (punctuation omitted).  Section 2 of the FAA provides in pertinent part:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  Section 4 of the FAA permits a party to obtain from a federal district court "an order directing that [an] arbitration proceed in the manner provided for" in an arbitration agreement.  9 U.S.C. § 4.  As the Second Circuit has held, "'[t]he Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (1988), requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation.'"  Vera v. Saks & Co., 335 F.3d 109, 116 (2d Cir. 2003) (quoting Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1063 (2d Cir. 1993)).

The Second Circuit has held that a court considering a motion to compel arbitration of a dispute first must

> determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must

5

consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004). "[U]nder the FAA, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" Id. at 171 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

When a motion to compel arbitration is brought, a "court applies a standard similar to that applicable for a motion for summary judgment," in that it must determine whether "there is an issue of fact as to the making of the agreement for arbitration ." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). "If undisputed facts in the record required the issue of arbitrability to be resolved against the Plaintiff as a matter of law," the motion to compel arbitration must be granted. Id. If, however, the party opposing arbitration can show "there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Id. (citing 9 U.S.C. § 4).

Because, as discussed below, we find defendants have not proven that the claims made in the complaint in this case are within the scope of the arbitration clause, it is unnecessary to reach any of the other issues raised.

III. DISCUSSION

  A. Law Governing the Scope of Arbitration Clauses

On the issue of scope, the Second Circuit has held:

To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should undertake a three-part inquiry. First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. See Mehler v. Terminix Int'l Co., 205 F.3d 44, 49 (2d Cir. 2000); Peerless Imps., Inc. v. Wine, Liquor & Distillery Workers Union Local One, 903 F.2d 924, 927 (2d Cir. 1990);

6

> McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988).  Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that "is on its face within the purview of the clause," or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause.  Rochdale Vill., Inc. v. Pub. Serv. Employees Union, 605 F.2d 1290, 1295 (2d Cir. 1979); see also Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 64 (2d Cir. 1983).  Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview.  See Cornell Univ. v. UAW Local 2300, 942 F.2d 138, 140 (2d Cir. 1991).  Where the arbitration clause is broad, "there arises a presumption of arbitrability" and arbitration of even a collateral matter will be ordered if the claim alleged "implicates issues of contract construction or the parties' rights and obligations under it."  Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 23 (2d Cir. 1995).

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir 2001), cert. denied, 534 U.S. 1020 (2001).

Notwithstanding the presence of a "broad" arbitration clause, the Second Circuit has since made clear that the FAA's

> liberal policy in favor of arbitration is limited by the principle that "arbitration is a matter of consent, not coercion.  Specifically, arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit."  JLM Indus., 387 F.3d at 171 (alteration in original) (citations and internal quotation marks omitted).  It is axiomatic that "[w]hether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties.  In this endeavor, as with any other contract, the parties' intentions control." Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) (citations and internal quotation marks omitted).

Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 395 (2d Cir. 2015).

Thus, the "presumption of arbitrability" that accompanies a broad arbitration clause must be viewed in this context.  Emphasizing the importance of effectuating the parties' intentions, the Second Circuit has noted in dicta,

> if an arbitration clause is best construed to express the parties' intent not to arbitrate certain disputes, that intent controls and cannot be overridden by the presumption of arbitrability.  Granite Rock [Co. v. Int'l Broth. Of Teamsters], 561

7

> U.S. [287,] 302, 130 S.Ct. 2847 [(2010)]; see also Allstate Ins. Co. v. Mun, 751 F.3d 94, 97 (2d Cir. 2014).  The presumption is a soft one, and has effect "only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate . . . [is] best construed to encompass the dispute." Granite Rock, 561 U.S. at 303, 130 S.Ct. 2847 (emphasis added).  The presumption may tip the scale if an agreement is truly ambiguous, see Allstate, 751 F.3d at 97, but it does not alter the controlling question: is the arbitration agreement "best construed to encompass the dispute"?

Lloyd v. J.P. Morgan Chase & Co., 791 F.3d 265, 270 (2d Cir. 2015) (some alteration in original).

### B. Analysis

In accordance with these directives, our task is to determine whether the arbitration clause reflects an intention to arbitrate the claims in Ahmad's complaint.  "When considering whether claims fall within the scope of an arbitration clause, . . . we analyze the factual allegations made in the plaintiff's complaint."  Holick, 802 F.3d at 395.  As summarized previously, those allegations describe Ahmad's claim that, during the course of his employment, he was the victim of discrimination on the basis of race, color, religion and national origin in numerous ways, including his termination.  Although the complaint describes how, at the time of the termination, iCIMS asserted that the reason for his termination was that Ahmad had violated the Confidentiality Agreement, see Comp. at *6, Ahmad seeks no relief under that Agreement.  Instead, the complaint adverts to the Confidentiality Agreement, which Ahmad refers to as the "company policy handbook," solely to make clear that Ahmad believes that iCIMS's claimed justification for his termination — that he violated the Confidentiality Agreement — was a

"complete lie." Id. (emphasis omitted). In other words, Ahmad claims that defendants' invocation of the Confidentiality Agreement to justify his termination was pretextual.

Turning to the arbitration clause itself, we note that, unlike cases cited by defendants, the clause does not state that any claims arising out of Ahmad's "employment" would be subject to arbitration. See, e.g., E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 282 (2002) (cited in Def. Mem. at 11). This is also not a case where there was an "employment contract" that contained a provision providing for arbitration of disputes "arising under . . . this Agreement" (that is, under the employment contract). See Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 74 (2d Cir. 1998) (cited in Def. Mem. at 10). Instead, the arbitration clause appears in a document entitled "Employee Confidentiality & Propriety Rights Agreement." This Confidentiality Agreement is not an employment contract and indeed explicitly states as much. See Confidentiality Agreement ¶ 7 ("this Agreement is not a contract of employment"). Instead, the Confidentiality Agreement recites a series of duties and other obligations that are imposed on the employee. The main provisions are: (1) the employee must keep company information confidential and not misuse it, id. ¶¶ 2.1, 2.2; (2) the employee must keep information belonging to prior employers confidential, id. ¶ 2.3; (3) the employee acknowledges that any work by the employee belongs to the company, id. ¶¶ 3.2, 3.3; (4) the employee must inform the company of the development of certain information, id. ¶ 3.6; (5) the employee must not take certain actions during his employment or for one year after leaving employment to interfere with the defendants' business, id. ¶ 5.1; and (6) the employee must not provide certain services to others during his employment, id. ¶ 5.3. There is also a provision entitled "Remedies" that gives only iCIMS (not the employee) the right to obtain certain forms of relief in any action to enforce the Confidentiality Agreement. See id. ¶ 8. The arbitration clause states that the parties agree to

9

arbitrate "[a]ny dispute, controversy or claim arising out of or related to this Agreement or any breach of this Agreement." Id. ¶ 11.3

The question before us is therefore whether Ahmad's complaint of discrimination in employment "arise[s] out of" or is "related to" the Confidentiality Agreement. While these phrases are "broad" in relation to the Confidentiality Agreement, Ahmad makes no claims seeking to enforce any provision of the Confidentiality Agreement. More to the point, no reasonable person reading the arbitration clause in the Confidentiality Agreement could conclude that it was intended to cover claims of employment discrimination given that the obligations in the Agreement do not involve the overall terms and conditions of employment. Instead, the obligations involve specific enumerated conditions, largely relating to confidentiality, that are placed on an employee's continued employment.

It appears defendants recognize the scope of the arbitration clause to some degree because they strain to characterize the complaint not as one involving employment discrimination at all, but rather as a suit about the Confidentiality Agreement. See Def. Mem. at 11; Def. Reply at 9-10. In essence, defendants contend that, because they claim to have fired Ahmad for breaching the Confidentiality Agreement, it follows that Ahmad's lawsuit "arises out of" or is "related to" the Confidentiality Agreement. See id.

We reject this argument. First, and most obviously, the argument ignores the fact that Ahmad does not complain merely about his termination but also complains about his treatment while he worked at iCIMS — alleging that he was the subject of discrimination during his employment in various ways. See Comp. at *6-7. Defendants do not even argue that Ahmad's

10

complaints about employment discrimination during his employment before his termination come within the terms of the arbitration clause.

Second, with regard to the termination itself, Ahmad's complaint is fairly read to complain that his firing — including the reason given for his firing — was discriminatory inasmuch as he alleges that the complaint is "only" about the discrimination he was subjected to by iCIMS.[4]  Comp. at *7.  Notwithstanding defendants' suggestion to the contrary, see Def. Reply at 10 (plaintiff has brought a "wrongful termination claim sounding in breach of contract"); accord Def. Mem. at 11, Ahmad does not purport to assert a breach of contract claim in the complaint.  Indeed, the Confidentiality Agreement was explicitly not an employment contract, and provides no promise of continued employment.  Thus, Ahmad could not bring a breach of contract claim under the Confidentiality Agreement to obtain a remedy for his termination.

Certainly, Ahmad cites to the Confidentiality Agreement in his complaint, but its only purpose is to assert that the claimed reason for his termination was "false," Comp. at *6, thus suggesting that iCIMS's reliance on the Confidentiality Agreement was a pretext for invidious employment discrimination.  While the defendants' invocation of the Confidentiality Agreement will presumably figure in their defense, it is not the case that Ahmad's claim against iCIMS in any way "arises out of" or is "related to" this Agreement in any rational understanding of those terms.  Contrary to defendants' assertion, Ahmad's complaint is not "premised around Plaintiff's

---

[4] We believe the complaint is reasonably clear that Ahmad is asserting that his termination was the result of discrimination.  For what it is worth, Ahmad has made this point unmistakable in papers filed in opposition to this motion.  See Pl. Sur-Reply at 6 (describing his "[w]rongful termination" complaint as "[b]iased actions towards plaintiff due to his race, religion, and ethnicity" and alleging that "a Caucasian worker would not be wrongfully terminated and harassed for his novel invention and have his invention illegally copied/stolen").

11

. . . contention that he did not violate" the Confidentiality Agreement. Def. Mem. at 6. Instead, it is premised on his contention that the actions taken against him in the course of his employment, including his termination, were the result of invidious discrimination. It is iCIMS's planned defense, not Ahmad's claim, that "arises out of" or is "related to" the Confidentiality Agreement.[5]

The Second Circuit has cautioned that, notwithstanding any ability to characterize an arbitration clause as "broad," it is the parties' "intention" that controls, Holick, 802 F.3d at 395, and thus in this case we must determine whether the arbitration clause is "best construed to encompass" plaintiff's employment discrimination complaint, Lloyd, 791 F.3d at 270 (emphasis omitted). Here, no such reading can be given to the arbitration clause.

IV. CONCLUSION

For the foregoing reasons, defendants' motion to compel arbitration (Docket # 24) is denied.

Dated: August 20, 2021
      New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[5] In making this determination we of course only address those claims made in the complaint, not any proposed amended complaint.